## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| RODELWIN DEL CARMEN FREITES ESPINOZA | ) | Case No. 1:25-cv-11583-GAO |
| | ) | |
| Petitioner, | ) | |
| | ) | **AMENDED PETITION FOR WRIT OF** |
| v. | ) | **HABEAS CORPUS** |
| | ) | |
| PATRICIA HYDE; PAMELA BONDI, U.S. | ) | |
| Attorney General; TODD LYONS, Acting | ) | |
| Director U.S. Immigrations and Customs | ) | |
| Enforcement; KRISTI NOEM, U.S. Secretary | ) | |
| of Homeland Security; and ANTONE MONIZ, | ) | |
| Superintendent of Plymouth County Correctional | ) | |
| Facility, | ) | |
| | ) | |
| Respondents. | ) | |

## INTRODUCTION

1.     The Due Process Clause of the Fifth Amendment provides that "[n]o person shall be … deprived of life, liberty, or property, without due process of law." Under the Due Process Clause, "liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 748, 755 (1987). Detention "for any purpose constitutes a significant deprivation of liberty that requires due process protection." *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992).

2.     For immigration detainees, as with other civil detainees, "[f]reedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty" protected by the Due Process Clause. *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001).

3.     Petitioner Rodelwin Del Carmen Freites-Espinoza ("Petitioner" or "Rodelwin") is

a twenty-six-year-old gay Venezuelan citizen. He is currently in the custody of Immigration & Customs Enforcement ("ICE") at the Plymouth County Correctional Facility in Plymouth, MA. Respondents have detained Petitioner for months without presenting him to an Immigration Judge in violation of Supreme Court standards requiring prompt presentment after arrest and regulations requiring expedited treatment of detained cases; they have unlawfully dismissed and refiled Petitioner's and his husband's removal proceedings in violation of regulations governing expedited removal; they have intentionally severed Petitioner's asylum case from his husband's even though they had previously been consolidated because they are inextricably intertwined; and Respondents have already attempted to transfer Petitioner away from this District in violation of ICE Policy 11022.1[1] and applicable National Detention Standards[2] interfering with his access to counsel and important legal supports and he remains at imminent risk of transfer.

4.    Petitioner is married to Irvin Alejandro Mundaray Patino ("Irvin") who is also a Venezuelan citizen and in the custody of ICE, previously at Plymouth but now at the Federal Correctional Institution in Berlin, NH ("FCI-Berlin"). Petitioner and Irvin entered the United States together in August 2023. They came to seek asylum from Venezuela based on their sexual orientation and political opinion. Upon their entry into the United States in August 2023, the Department of Homeland Security ("DHS") served both men with Notices to Appear, which initiated their removal proceedings in the Immigration Court.

5.    Both men filed asylum applications in August 2024 and their cases were proceeding in the Boston Immigration Court where they were consolidated as the two men's cases are inextricably intertwined.

6.    Both Petitioner and Irvin were arrested by ICE on or about April 16, 2025 and

---

[1] Available at https://www.ice.gov/doclib/detention-reform/pdf/hd-detainee-transfers.pdf.
[2] Available at https://www.ice.gov/doclib/detention-standards/2019/nds2019.pdf.

placed in custody at the Plymouth County Correctional Facility. They were both given and passed credible fear interviews on or about April 25, 2025, yet ICE thereafter improperly moved to dismiss the men's proceedings, which the Immigration Court granted, on May 6, 2025, placing the men in expedited removal proceedings, despite that they had already passed credible fear interviews. ICE's conduct meant that Petitioner's and his husband's cases were no longer consolidated because they were arbitrarily dismissed by ICE only to be re-filed.

7.      ICE served Irvin with a new Notice to Appear dated May 10, 2025, promptly placed him in removal proceedings in the Chelmsford Immigration Court with his first Master Calendar Hearing set by DHS for May 29, 2025, and transferred him away from Petitioner to FCI Berlin. He has now seen an Immigration Judge twice and his individual hearing is scheduled for July 28, 2025.

8.      Petitioner, however, has been detained at the Plymouth County Correctional Facility since April 2025 and he has not yet seen an Immigration Judge. While Petitioner's case is factually and legally conjoined with his husband's case, as they are both seeking asylum from Venezuela in part based on their sexual orientation and shared harm in Venezuela, ICE has arbitrarily separated the two men by dismissing and refiling their cases so that they are no longer consolidated, and physically separating them so that they are no longer detained in the same facility and assigned to the same judge.

9.      Only after Petitioner filed the original habeas petition in this action, Respondents filed Petitioner's new Notice to Appear with the Chelmsford Immigration Court, and it was docketed on June 11, 2025, approximately two full months after ICE first detained Petitioner at Plymouth. However, Respondent DHS did not set Petitioner's first Master Calendar Hearing until October 8, 2025, approximately <u>six months</u> after it first detained Petitioner *See* Exhibit A

hereto (DHS Notice to Appear dated June 5, 2025 and setting first hearing date for October 8, 2025). Notably, the Notice to Appear fails to indicate that Petitioner *passed* his Credible Fear Interview.

10.    On May 30, 2025, Petitioner learned that he was imminently going to be removed from the Plymouth County Correctional Facility and transferred to another facility or removed from the United States. His in-process transfer was halted by this Court's Order issued in this action on May 30, 2025, the same day Petitioner initiated this action, stating that "the petitioner shall not be moved outside of the District of Massachusetts without providing the Court 48 hours' advance notice of the move and the reason therefor." *See* ECF No. 4.

11.    Petitioner's detention has been unlawfully delayed by Respondents' deliberate and arbitrary actions against Petitioner. Respondents have failed to follow the required regulations on expedited removal, on the filing of charging documents, and they have failed to follow their own policy on transfers. Respondents' conduct has prejudiced Petitioner by unlawfully delaying his detention and depriving him of his liberty, severing his case from his husband's, and depriving both Petitioner and his husband of proceeding on their asylum claims together, and providing testimony in each other's cases, even though they are inextricably intertwined.

12.    Petitioner remains at risk of imminent transfer, both of which have and would interfere with his access to counsel and ability to adequately and appropriately present his asylum case along with his husband's in contravention of the Due Process Clause of the Fifth Amendment, the Immigration and Nationality Act ("INA"), and the Administrative Procedure Act ("APA"). To vindicate Petitioner's constitutional and statutory rights, Petitioner asks the Court to grant this Petition, enjoin Petitioner's transfer, and order his release from custody. In the

alternative, Petitioner asks the Court to order the Chelmsford Immigration Court to conduct a

bond hearing to ameliorate Respondents' unlawful and arbitrary delay in presenting Respondent

before an Immigration Judge.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 (federal

questions), 1651 (all writs act), 2241 (habeas corpus), and 5 U.S.C. §§ 702, 706 (review of

agency action). Sovereign immunity against actions for relief other than money damages is

waived pursuant to 5 U.S.C. § 702.

14.     This Court may grant relief under 28 U.S.C. §§ 2241, 2243 and 8 U.S.C.

1252(e)(2) (habeas corpus), 28 U.S.C. §§ 2201-02 (declaratory relief), 28 U.S.C. § 1651 (all

writs act), 5 U.S.C. § 702 (judgment against U.S. officers), Federal Rule of Civil Procedure 65

(injunctive relief), as well as the Fifth Amendment to the U.S. Constitution.

15.     Venue is proper because Petitioner is detained in Plymouth, MA, in the District of

Massachusetts, and a substantial part of the events or omissions giving rise to Petitioner's claims

occurred in this district.

## REQUIREMENTS OF 28 U.S.C. § 2243

16.     The Court must grant the petition for writ of habeas corpus or issue an order to

show cause ("OSC") to the respondents "forthwith," unless the petitioner is not entitled to relief.

28 U.S.C. § 2243. If an order to show cause is issued, the Court must require respondents to file

a return "within *three days* unless for good cause additional time, not exceeding twenty days, is

allowed." *Id.* (emphasis added).

17.     Courts have long recognized the significance of the habeas statute in protecting

individuals from unlawful detention. The Great Writ has been referred to as "perhaps the most

important writ known to the constitutional law of England, affording as it does a *swift* and imperative remedy in all cases of illegal restraint or confinement." *Fay v. Noia*, <u>372 U.S. 391, 400</u> (1963) (emphasis added).

## <u>PARTIES</u>

18.    The Petitioner, Rodelwin Del Carmen Freites-Espinoza, is a citizen of Venezuela who has established a credible fear of being removed to Venezuela. He is a gay man who is legally married to Irvin Alejandro Mundaray Patino, also a Venezuelan citizen, who is currently in the custody of ICE at FCI Berlin. Petitioner is currently detained at the Plymouth County Correctional Facility in Plymouth, MA and is in the custody, under the direct control, of Respondents and their agents.

19.    Respondent Patricia Hyde is the Acting Director of the Boston Field Office for Immigration & Customs Enforcement/Enforcement & Removal Operations at 1000 District Avenue, Burlington, MA 01803.

20.    Respondent Pamela Bondi is the U.S. Attorney General at the U.S. Department of Justice, which is a cabinet-level department of the U.S. government.

21.    Respondent Todd Lyons is the Acting Director for U.S. Immigration and Customs Enforcement ("ICE") and is responsible for ICE's policies, practices, and procedures, including those relating to the detention of noncitizens during their removal procedures.

22.    Respondent Kristi Noem is the U.S. Secretary of Homeland Security ("DHS") and is responsible for the administration of the immigration laws pursuant to <u>8 U.S.C. § 1103</u>.

23.    Respondent Antone Moniz is the Superintendent of Plymouth County Correctional Facility and has immediate physical custody of the Petitioner pursuant to the facility's contract with DHS to detain noncitizens. Respondent Moniz is a legal custodian of the Petitioner.

6

24.    All respondents are named and sued in their official capacities.

## LEGAL FRAMEWORK

25.    Under 28 U.S.C. § 2243, courts may issue "swift and imperative remedy in all cases of illegal restraint or confinement" through the instant habeas corpus petition. *Fay v. Noia*, 372 U.S. 391, 400 (1963) (emphasis added).

26.    It is well-established that if noncitizens are detained during their removal proceedings, that detention must not violate their constitutional and statutory rights. *See Zadvydas v. Davis,* 533 U.S. 678, 690 (2001); *Hernandez-Lara v. Lyons*, 10 F.4th 19, 36–38 (1st Cir. 2021). Courts have held that when ICE detains an individual, it assumes the responsibility of ensuring that their constitutional rights are upheld. *See, e.g.*, *Doe et al. v. DHS*, No. 3:24-cv-00259-SLH-PLD, ECF 76 (W.D. Pa. Jan. 31, 2025).

27.    These rights include those protected under the Fifth Amendment Right to Due Process, Immigration and Nationality Act ("INA"), and Administrative Procedure Act ("APA").

28.    Respondents' decision to dismiss Petitioner's consolidated removal proceedings *after* he had passed a Credible Fear Interview, severing Petitioner's asylum claim from his husband's, holding Petitioner for months without presenting him to an Immigration Judge, scheduling his *first* Master Calendar Hearing to take place only *after* he had already been detained for six months – a timeline the U.S. Supreme Court has recognized as prolonged, and subjecting him to imminent transfer outside of the jurisdiction in which he primarily resided and where his immigration counsel, legal resources, and husband are located violates these constitutional and statutory rights. Under 28 U.S.C. § 2243, this Court is entitled to vindicate these rights and grant an appropriate remedy.

## I.    DETENTION PENDING REMOVAL PROCEEDINGS; EXPEDITED REMOVAL

### A.    <u>Initial Apprehension; Expedited Removal; and Referral to Immigration Court</u>

29.     To remove an allegedly deportable or inadmissible noncitizen from the United States, the government must, with some exceptions, initiate a removal proceeding before an immigration judge under Section 240 of the Immigration and Naturalization Act (INA). <u>8 U.S.C. § 1229a(a)</u>. A removal proceeding begins when an authorized agent of DHS files a Notice to Appear with the immigration court operated by EOIR. *See* <u>8 C.F.R. §§ 239.1(a)</u>, <u>1239.1</u>. ICE and U.S. Customs and Border Protection are the two main agencies within DHS that are authorized to initiate removal proceedings. *See* <u>8 C.F.R.§ 239.1</u>.

30.     Congress has authorized DHS to initially take an alleged non-citizen into custody without a warrant (1) if the individual enters or attempts to enter the United States in violation of the immigration laws in the officer's presence or view, or (2) if the officer reasonably believes the individual is in the United States in violation of the immigration laws and is likely to escape before an arrest warrant can be obtained. <u>8 U.S.C. § 1357(a)(2)</u>.

31.     However, after 48 hours DHS must determine whether to continue to keep the person in custody and issue a Notice to Appear. <u>8 C.F.R. § 287.3(d)</u>. DHS also purports to have authority under applicable regulations to arrest and take into custody an alleged non-citizen pursuant to an administrative warrant "at the time of issuance of the Notice to Appear, or at any time thereafter." <u>8 C.F.R. § 1236.1(b)</u>. DHS policy and practice is that its agents and officers need not obtain a judicial warrant prior to arrest or a judicial finding of probable cause after arrest.

32.     In this case, both Petitioner and his husband Irvin were placed in Section 240 proceedings following their entry into the United States and issued Notices to Appear.

33.     Often, individuals arriving at a port of entry and seeking asylum take a slightly different procedural route before DHS issues them a Notice to Appear. DHS would process them for so-called "expedited removal," for which a hearing before an immigration judge is allowed in very limited circumstances. 8 U.S.C. § 1225(b)(1)(A); 8 C.F.R. §§ 235.3(b)(2), (b)(5)(iv). The Trump Administration has expanded expedited removal to apply to noncitizens (1) anywhere in the United States, (2) who cannot prove they have resided in the U.S. for at least two years will be subject to an expedited deportation process. Petitioner and his husband were not placed in expedited removal proceedings at the border.

34.     When an individual subject to expedited removal expresses a fear of persecution if removed, expedited removal is not permitted, and he or she is referred for a credible fear interview before an asylum officer with United States Citizenship and Immigration Services. 8 C.F.R. § 235.3(b)(4).

35.     If the asylum officer determines that the individual has a credible fear, then the case is referred to the Immigration Court through the issuance and filing of the Notice to Appear. 8 U.S.C. § 1225(b)(1)(B)(ii); 8 C.F.R. § 235.6(a)(1)(ii). At that point, the case proceeds under section 240 of the INA like any other removal proceeding. 8 C.F.R. § 208.30(f).

**B.     Initial Master Calendar Hearing**

36.     All individuals detained pending removal proceeding are entitled to the same rights and procedures under the INA. *See generally* 8 U.S.C. § 1229a.

37.     A removal proceeding commences when DHS files the Notice to Appear with the Immigration Court. 8 C.F.R. § 1003.14. The Notice to Appear provides the time, place and date of the initial hearing in removal proceedings, also called an initial Master Calendar Hearing, where practicable. 8 C.F.R. § 1003.18(b). If the Notice to Appear does not contain this

information, the Immigration Court schedules the initial Master Calendar Hearing and provides notice to the government and the alleged noncitizen as to its time, place, and date. *Id.*

38.    Applicable regulations require that the removal hearing be completed as promptly as possible. In addition, cases involving detained individuals must proceed on an expedited docket. *See* 8 U.S.C. § 1229(d)(1) ("In the case of an alien who is convicted of an offense which makes the alien deportable, the Attorney General shall begin any removal proceeding as expeditiously as possible after the date of the conviction."); 8 C.F.R. § 1208.5(a) (requiring that, for detained asylum seekers, "[w]here possible, expedited consideration shall be given to applications of detained aliens"); Immigration Court Practice Manual, Chapter 9.1(e) ("Proceedings for detained aliens are expedited").[3]

39.    "[T]he Master Calendar is the pre-trial docket." IJ Benchbook, Introduction to the Master Calendar at 1.[4]

40.    Because it "may take more than one master calendar session to get a case ready," *id*., a series of Master Calendar Hearings may be held to narrow the issues in a removal proceeding, until a final hearing is held to decide removability and, if applicable, eligibility for relief from removal.

41.    On information and belief, EOIR, which operates the Immigration Court, is made aware when a Notice to Appear is filed whether the case involves a detained individual or a non-detained individual. On information and belief, when EOIR receives a Notice to Appear, a clerk enters the information into the court's computer system and generates a hearing date for the next available hearing. If the case involves a detained individual, EOIR puts the case on the Immigration Court's detained docket, which is more expedited than its non-detained docket.

---

[3] https://www.justice.gov/eoir/office-chief-immigration-judge-0.
[4] https://www.justice.gov/sites/default/files/eoir/legacy/2014/08/15/Purpose_and_H istory_of_MC.pdf.

However, EOIR does not schedule more expeditious initial Master Calendar Hearings for detainees than it does for subsequent Master Calendar Hearings for detainees. As a result, EOIR ordinarily sets the initial Master Calendar Hearing for detained immigration cases in the District of Massachusetts for one to two months after receiving the Notice to Appear.

42. The initial Master Calendar Hearing is a crucial stage of removal proceedings. It is the first time a neutral adjudicator (the immigration judge) explains the nature of the removal hearing, the contents of the Notice to Appear "in nontechnical language," the right to representation at his or her own expense, and the availability of pro bono legal services. 8 C.F.R. § 1240.10(a). The immigration judge also notifies detainees about the right to see the government's evidence against them and provides the first opportunity to request that evidence. *Id.*; *see also Dent v. Holder*, 627 F.3d 365, 374 (9th Cir. 2010); 8 U.S.C. § 1229a(c)(2)(B). The immigration judge explains these things in the noncitizen's own language, with the aid of an interpreter. *See* Immigration Court Practice Manual, Chapter 4.15(f) ("If necessary, an interpreter is provided to an alien whose command of the English language is inadequate to fully understand and participate in the hearing."). This differs from the Notice to Appear alone, which consists largely of technical legalese in English and thus would not be understandable to someone who is not versed in immigration law or does not read English.

43. The initial Master Calendar Hearing also provides the first opportunity for the immigration judge to verify service of the Notice to Appear, provide the Notice to Appear if service was not made, to examine the Notice to Appear for defects, and demand correction of those defects. *See* IJ Benchbook, Introduction to the Master Calendar at 3 ("The NTA is not prepared by lawyers and there will be errors.").

44.     Importantly, at the initial Master Calendar Hearing, unrepresented detainees who do not speak or write English may, for the first time, request a bond hearing with the aid of an interpreter in their native language. *See* 8 C.F.R. §§ 1003.19(b), (c) (stating that bond hearings may be requested "orally [in court], in writing, or, at the discretion of the Immigration Judge, by telephone … to the Immigration Court having jurisdiction over the place of detention"); *see* 8 C.F.R. § 1003.33 (requiring immigration court documents to be filed in the English language); Immigration Court Practice Manual, Chapter 4.15(f). Following the request, and for those who are eligible, the Immigration Judge must schedule the bond hearing at "the earliest possible date." *See* Immigration Court Practice Manual, Chapter 9.3(d).

45.     At the initial Master Calendar Hearing, the immigration judge may identify several forms of relief for which the detainee may be eligible, allowing the detainee to begin working on his or her case after the hearing. For unrepresented individuals, the judge must assist the detainee in doing so. *See Agyeman v. INS*, 296 F.3d 871, 883-84 (9th Cir. 2002) (explaining the immigration judge "has a duty to fully develop the record when an alien proceeds pro se by probing into relevant facts and by providing appropriate guidance as to how the alien may prove his application for relief"). This is crucial in detained cases, as individuals "may have limited access to relevant documents and will, therefore, depend even more heavily on the [immigration judge] for assistance in identifying appropriate sources of evidence to support his claim." *Id.*

## C.     Procedural Due Process Requires Prompt Post-Arrest Hearing

46.     Although immigration authorities "may intercept individual aliens and subject them to hearings for the purpose of determining whether they are deportable and restrain them of their liberties for enforced deportation after hearing, . . . detention for long and unreasonable periods before hearing is illegal." *Carlson v. Landon*, 186 F.2d 183, 186 (9th Cir. 1950).

47.    "The first appearance has such great value in protecting numerous rights that its denial presumptively disrupts those rights. Therefore, as a matter of constitutional prophylaxis, the denial of a first appearance offends the Due Process Clause." *Armstrong v. Squadrito*, 152 F.3d 564, 573 (7th Cir. 1998).

48.    The Due Process Clause usually "requires . . . a hearing before the State deprives a person of liberty or property." *Zinermon v. Burch*, 494 U.S. 113, 127 (1990). If a pre-arrest hearing is not viable, due process mandates a "prompt post-deprivation hearing at which some showing of the probable validity of the deprivation must be made." *Comm'r of Internal Revenue v. Shapiro*, 424 U.S. 614, 629 (1976). Therefore, "[p]romptness is the touchstone" of due process "analysis into the timeliness of post-deprivation review." *Jordan v. Jackson*, 15 F.3d 333, 349 (4th Cir. 1994). *See also United States v. Tejada*, 255 F.3d 1, 4 & n. 6 (1st Cir. 2001) (recognizing delay in presenting arrestee to magistrate judge may "effect[] a constitutional deprivation").

49.    To determine if a post-arrest hearing is sufficiently prompt to satisfy the Due Process Clause, courts consider three distinct factors: (1) "the private interest that will be affected by the official action," (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards," and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

50.    Under this framework, the current delay in presenting Petitioner to an immigration judge violates due process because (1) the individual's interest in freedom from restraint is paramount; (2) the risk of erroneous detention is significant when an initial

appearance is not promptly provided, and a prompt hearing would significantly reduce that risk; and (3) the government has no legitimate interest in delaying first appearance before an immigration judge, and any burdens in ensuring a prompt appearance cannot defeat the right to a prompt hearing given the deprivation of liberty. *See Cancino Castellar v. McAleenan*, 388 F. Supp.3d 1218 (S.D. Cal. 2019) (substantive and procedural due process require prompt presentment in immigration context).

51.     ICE knows that its delay in filing Notices to Appear in Immigration Court is unlawful. It settled a similar claim in the Southern District of California by agreeing that, for detainees in that district, ICE must file the NTA within 72 hours after arrest and must provide detainees in that district with initial hearings within 11 days after arrest. *See* Settlement Agreement and Release (D.E. 242-2), *Cancino Castellar v. Mayorkas*, C.A. 17-491 (S.D. Cal.).[5]

52.     Here, ICE has caused Petitioner to be detained already for more than two months unnecessarily, by improperly and arbitrarily dismissing the first NTA that it served on him even though Petitioner had already passed a credible fear interview, and then delaying filing a new NTA for more than a month after the first NTA was dismissed and only then because Petitioner filed this habeas action. As it is, Respondent DHS did not schedule Petitioner to have his first Master Calendar hearing until October 8 2025, six months after the commencement of his detention.[6]

53.     The immigration judge will not set a date for Petitioner's individual hearing, at which his asylum application will be decided, until the first or second Master Calendar Hearing

---

[5] Publicly available at https://www.aclu-sdic.org/sites/default/files/field_documents/2024_01_18_242-2_bv_decl_ex_a_-_settlement_agreement.pdf.
[6] After this action was filed and Respondents submitted Petitioner's Notice to Appear to the Chelmsford Immigration Court and the Court set Petitioner's first Master Calendar Hearing for October 8, 2025, DHS filed a Motion for an Expedited Hearing, which Petitioner joined. As of the filing of this Amended Petition, Petitioner's hearing date has not yet changed.

takes place. Typically, the individual hearing is scheduled to occur several months after the last

Master Calendar Hearing. If Petitioner's first Master Calendar Hearing does not occur before

October 8, 2025, his Individual Hearing on the merits of his asylum application is not likely to

take place before January 2026, all while Petitioner remains incarcerated by ICE.

54.    The delay in Petitioner's detention has been caused by Respondent's (1) arbitrary

unlawful dismissal of Petitioner's Notice to Appear when he had already passed a Credible Fear

Interview; and (2) arbitrary and unlawful delay in filing the new Notice to Appear with the

Chelmsford Immigration Court.

55.    Respondents' unlawful and arbitrary actions have unfairly extended Petitioner's

custody by months; they have prejudiced Petitioner and his husband by arbitrarily severing the

two asylum cases, placing the two men in different detention facilities, and putting them on

drastically different schedules for resolution such that they cannot be re-consolidated in the

Immigration Court, and thereby preventing Petitioner from participating in his husband's case

even though the two cases are inextricably intertwined.

### D.    Due Process Requires That Petitioner Be Provided With A Bond Hearing By The Immigration Court

56.    Petitioner asks this Court to order the Immigration Court to conduct a bond

hearing before a neutral arbiter to remedy the unlawful delay in his detention in violation of

Petitioner's due process rights.

57.    As of this date, Petitioner has been detained for nearly 10 weeks and he is not

scheduled to see an Immigration Judge for the first time until October 8, 2025, nearly six months

*after* he was first detained. There is no end to Petitioner's detention in the reasonably foreseeable

future.

58.     Petitioner is currently subject to mandatory detention under 8 U.S.C. § 1225(b)(1)(B)(ii) because he has passed a "credible fear interview." The government interprets 8 U.S.C. § 1225(b) to require mandatory detention without a bond hearing for all "arriving aliens," which it has defined to include individuals who have passed a credible fear interview, for the full length of time necessary to complete removal proceedings, even if that time becomes unreasonably prolonged. *See* 8 C.F.R. § 1003.19(h)(2)(i)(B) (stating that an Immigration Judge may not conduct a custody determination of an "arriving alien").

59.     Petitioner's prolonged detention, caused by Respondents' unlawful and arbitrary action in dismissing his Petitioner's removal proceedings *after* he passed a credible fear interview only to then file a new Notice to Appear two months after he had already been detained, violates the Fifth Amendment of the U.S. Constitution because it has deprived Petitioner of liberty without due process of law and the Immigration and Nationality Act because it is not authorized by statute.

**E.     Respondents' Transfer of Petitioner Outside of this District Will Violate The Due Process Clause of the Fifth Amendment and the Immigration and Nationality Act.**

60.     Under the Due Process Clause of the Fifth Amendment and the Immigration and Nationality Act, Petitioner is entitled to be represented by counsel of his choice during his removal proceedings.

61.     "It is well established that the Fifth Amendment entitles [noncitizens] to due process of law in deportation proceedings." *Mekhoukh v. Ashcroft*, 358 F.3d 118, 128 (1st Cir. 2004) (quoting *Morales v. INS*, 208 F.3d 323, 327 n.1 (1st Cir. 2000)). Among the rights that due process safeguards is a noncitizen's right to effective assistance of counsel. *See Lozada v. INS*, 857 F.2d 10, 13 (1st Cir. 1988) (explaining that "[i]neffective assistance of counsel in a

16

deportation proceeding is a denial of due process . . . if the proceeding was so fundamentally unfair that the [noncitizen] was prevented from reasonably presenting his case" (internal quotation marks and citation omitted)); *Essen v. Gonzales*, 240 F. App'x 873, 875 (1ˢᵗ Cir. 2007) ("We have recognized that, under certain circumstances, the abridgement of access to counsel in removal proceedings may amount to a denial of due process."); *Guerrero-Santana v. Gonzales,* 499 F.3d 90, 93 (1ˢᵗ Cir. 2007) (concluding that ineffective assistance of counsel may constitute a denial of due process if the proceeding is rendered fundamentally unfair).

62.     Recognizing that due process safeguards meaningful access to counsel, Congress codified the right to counsel in the INA at 8 U.S.C. § 1362. *See, e.g.*, *Hernandez Lara v. Barr*, 962 F.3d 45, 54 (1ˢᵗ Cir. 2020) ("The statutory right to counsel is a fundamental procedural protection worthy of particular vigilance."); *Garcia v. Sessions*, 856 F.3d 27, 51 (1ˢᵗ Cir. 2017) (Stahl, J., dissenting) (recognizing that the INA guarantees the right to counsel and other due process protections); *see also Ardestani v. INS*, 502 U.S. 129, 138 (1991) ("We are mindful that the complexity of immigration procedures, and the enormity of the interests at stake, make legal representation in deportation proceedings especially important."). That provision provides that a noncitizen "shall have the privilege of being represented . . .  by such counsel . . . as he shall choose." 8 U.S.C. § 1362. This right is "an integral part of the procedural due process to which the [noncitizen] is entitled." *Saakian v. INS*, 252 F.3d 21, 24 (1ˢᵗ Cir. 2001) (citing *Batanic v. INS*, 12 F.3d 662, 667 (7ᵗʰ Cir. 1993)).

63.     Moreover, the First Amendment protects an individual's ability to hire and consult with an attorney. *See United Mine Workers of Am. V. Illinois State Bar Ass'n,* 389 U.S. 217, 221–22 (1967) ("[T]he freedom of speech, assembly, and petition guaranteed by the First and Fourteenth Amendments gives petitioner the right to hire attorneys on a salary basis to assist

. . . in the assertion of their legal rights."); *Nolan v. Scafati,* 430 F.2d 548, 551 (1st Cir. 1970)

(asserting that a habeas petition can vindicate a constitutional right like the First Amendment

"corollary right to obtain assistance."); *Denius v. Dunlap*, 209 F.3d 944, 954 (7th Cir. 2000)

("[T]he First Amendment protects the right of an individual or group to consult with an attorney

on any legal matter.").

64.     If Petitioner is transferred out of this District, as ICE has already once attempted

to do, he will not be able to meet with his counsel here, and she will not be able to fully and

fairly prepare his asylum case despite Petitioner's right to hire the counsel of his choice.

**F.    The APA Requires that Petitioner's Detention and Transfer Comply with the Agency's Own Policies**

65.     Under the APA, Petitioner is protected from being "adversely affected or

aggrieved by agency action" and is "entitled to judicial review." 5 U.S.C. § 702.

66.     Under *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954), and

related cases, an agency and agency officials are required to follow their own regulation and

policies. *Rotinsulu v. Mukasey*, 515 F.3d 68, 72 (1st Cir. 2008) ("An agency has an obligation to

abide by its own regulations."); *see Morton v. Ruiz*, 415 U.S. 199, 235 (1974) ("Where the rights

of individuals are affected, it is incumbent upon agencies to follow their own procedures.").

*Accardi*'s holding that agencies must follow their own guidelines applies with particular force

where "the rights of individuals are affected," as is the case here. *Morton v. Ruiz*, 415 U.S. 199,

235 (1974); *see also Jimenez v. Cronen*, 317 F. Supp. 3d 626, 638–39 (D. Mass. 2018) ("When

regulations are promulgated to protect a fundamental right derived from the Constitution or a

federal statute, . . . the Due Process Clause requires federal agencies to follow them[.]" (internal

quotation marks and citations omitted)).

67.     An agency's unexplained failure to follow its own rules constitutes "arbitrary"

and "capricious" conduct in violation of the APA. 5 U.S.C. § 706(2)(A); *United States ex. rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009).

68.    Courts in the First Circuit have held that the *Accardi* doctrine applies to internal agency policies. *See, e.g.*, *Roe v. Mayorkas*, No. 22-CV-10808-ADB, 2023 WL 3466327, at *15 (D. Mass. May 12, 2023) (allowing an APA claim to proceed when plaintiff sued for violation of, inter alia, a USCIS Policy Manual); *Lobsters, Inc. v. Evans*, 346 F. Supp. 2d 340, 348 (D. Mass. 2004) (finding an abuse of discretion when an ALJ deviated from agency policy without explanation and stating "[i]t is settled law that an agency ordinarily must follow its own policies and procedures and may depart therefrom only with reasoned explanation.").

69.    When it first attempted to transfer Petitioner on May 30, 2025, ICE failed to comply with its own binding policy, ICE Policy Number 11022.1, which governs the transfer of noncitizens detained in ICE custody. Here, Petitioner exhibits many of the factors that Policy 11022.1 states ICE should consider not transferring him out-of-state. His husband is nearby albeit in another detention facility but still within the same Immigration Court; his attorney of record is located in the Boston area, the resources necessary to prepare Petitioner's asylum case, namely medical and psychological evaluators are in the Boston area and can evaluate Petitioner in person at the Plymouth County Correctional Facility, and Petitioner has pending removal proceedings in Chelmsford Immigration Court.

70.    Upon information and belief, the Assistant Field Office Director or higher official did not approve the May 30, 2025 transfer, which was stopped by this Court's no-transfer order, nor did they explain in writing why a transfer would be deemed "necessary" in Petitioner's A-file. In addition, no notice was provided to Petitioner's counsel.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

71.     Petitioner Rodelwin Del Carmen Freites Espinoza was born on January 14, 1999 in Venezuela. He is currently 26 years old.

72.     In 2023, Petitioner traveled to the United States to seek protection from persecution directed at him based on his sexual orientation and political opinion. On or about August 23, 2023, Petitioner entered the U.S. with his now-husband Irvin Alejandro Mundaray Patino.

73.     ICE officials issued Petitioner an Order of Release on Recognizance on September 25, 2023. He was issued a Form I-862 Notice to Appear charging him as "an alien present in the United States who has not been admitted or paroled," and placing him in removal proceedings under INA § 240 (8 U.S.C. § 1229a). *See id.*

74.     On or about August 30, 2023, DHS docketed Petitioner's Notice to Appear with the Immigration Court, and he thereafter submitted his I-589, Application for Asylum and Withholding of Removal.

75.     On or about June 28, 2024, Petitioner and Irvin were legal married in Worcester, Massachusetts. Petitioner and Irvin's cases were consolidated by the Immigration Court because their claims are inextricably intertwined.

76.     On or about April 16, 2025, Petitioner and Irvin were placed in Respondents' custody at the Plymouth County Correctional Facility in Plymouth, MA.

77.     On or about April 25, 2025, Petitioner and Irvin were given and passed credible fear interviews establishing a basis to seek fear-based immigration relief through the Immigration Court. *See* Exhibit B (Petitioner's Credible Fear Interview documents).

78.     On or about May 6, 2025, *after Petitioner passed his credible fear interview and*

*even though he already had an asylum application pending,* Respondents arbitrarily obtained the dismissal of Petitioner's (and Irvin's) removal proceedings in the Immigration Court.

79.    On or about May 14, 2025, DHS filed a new Notice to Appear for Irvin with the Chelmsford Immigration Court starting new removal proceedings against Irvin that were now separate from Petitioner who is an integral part of Irvin's claim. Two days later, on May 16, 2025, Respondents transferred Irvin to FCI Berlin while Petitioner remained in Plymouth.

80.    Two months after Petitioner was first put in custody by Respondents, Respondent DHS filed a new Notice to Appear in the Immigration Court for Petitioner designating October 8, 2025 as the first date when he would see an Immigration Judge.

81.    Because he passed his credible fear interview, Petitioner is being held in "mandatory detention" and is not eligible to request a bond hearing from the Immigration Judge.

82.    Petitioner has been detained at the Plymouth County Correctional Facility in Plymouth, MA since April 16, 2025 without having an opportunity to present his claim for asylum in the Immigration Court following the positive credible fear result. Based on Respondent DHS's actions, Petitioner will not see an Immigration Judge until after he has been detained for six months.

83.    Irvin's Individual Hearing is already scheduled to take place on July 28, 2025. Petitioner anticipates that since he is detained apart from his husband Respondents will not permit him to provide oral testimony at his husband's individual hearing.

84.    On May 30, 2025, Petitioner received notice, upon information and belief, that he is imminently going to be transferred away from the Plymouth County Correctional Facility and may be removed.

85.     DHS has been detaining Petitioner for an extended period of time without promptly presenting him for an initial hearing before an immigration judge. DHS has separated Petitioner and Irvin forcing them to proceed with their cases separately, even though they are both in Respondents' custody, they are legally married, and they are included in each other's credible fear claims. Petitioner has been languishing in the Plymouth County Correctional Facility since April 2025 without being permitted to continue to pursue his fear-based claim for immigration relief.

86.     After DHS transferred Irvin to FCI Berlin, Petitioner was distraught. When he expressed his distress to detention officials, they isolated him in solitary confinement. Petitioner has since fallen ill with the flu in the wake of this trauma and has not received adequate medical attention from Respondents. As a survivor of severe trauma at the hands of government officials in Venezuela, Petitioner's mental state is rapidly deteriorating in a carceral setting far from his spouse.

87.     The requirement of prompt presentation after arrest "stretches back to the common law, when it was one of the most important protections against unlawful arrest." *Corley v. United States*, 556 U.S. 303, 320 (2009). Excessive delays in judicial presentment deprive immigration detainees of due process, prevent them from exercising important rights and remedies, impede the progress of removal proceedings – particularly in this case where Petitioner's removal proceedings were dismissed and refiled, and bear no reasonable relation to a valid purpose.

88.     Respondents' treatment of Petitioner has resulted in an unreasonable and extended detention for Petitioner without prompt presentment to a judge. Therefore, Petitioner seeks declaratory, injunctive, and habeas corpus relief that will prevent Respondents from continuing

to detain Petitioner because he has already been detained for an unreasonable period of time

without having been presented before an Immigration Judge.

89.    Further, Respondents' potential transfer or removal of Petitioner outside of

Massachusetts will interfere with Petitioner's ability to pursue immigration relief with his

husband in a consolidated action and continue to access pro bono immigration counsel, and

resources necessary to adequately prepare his asylum case.

### G.    Any Transfer of Petitioner Outside of This District Would Violate Due Process as Well as ICE's Own Policy.

90.    On May 30, 2025, Petitioner learned that he was imminently going to be

transferred or removed from the Plymouth County Correctional Facility. He was not told where

he was going to be sent. Any transfer would be hundreds if not thousands of miles away from

where he previously lived, his husband, and his retained counsel. Petitioner remains at risk of

being transferred to a detention center out-of-state per ICE practice under the new

administration.

91.    Petitioner's potential transfer is part of a broader reported practice under the

current administration of ICE transferring noncitizens to detention centers out of state throughout

the country, often in the southern United States.[7] At Plymouth County Correctional Facility

alone, ICE transferred over 100 individuals detained at Plymouth in Massachusetts to a detention

center in New Mexico within a month,[8] and transferred more individuals to other detention

---

[7] *See, e.g.*, Eric Levenson & Gloria Pazmino, *Why ICE Is Really Moving Detainees over a Thousand Miles from Where They Were Arrested*, CNN (Apr. 10, 2025), https://www.cnn.com/2025/04/10/us/immigration-detainees-trump-ice-students-visa/index.html; American Immigration Council, *Freedom of Information Act Request for Records of ICE Transfers of Detained Individuals* (Feb. 10, 2025) (reporting that "ICE has transferred individuals away from facilities where they have been able to secure legal representation").

[8] Molly Farrar, *Immigrants in ICE Custody Face Rapid Transfers, Limited Legal Help*, Boston.com (Mar. 26, 2025) (reporting that within a month, more than 100 people in ICE custody were moved from Plymouth County to a facility in New Mexico), https://www.boston.com/news/local-news/2025/03/26/immigrants-in-ice-custody-face-rapid-transfers-limited-legal-help/.

centers across state lines.[9] Moreover, during a hearing in the Chelmsford Immigration Court on April 3, 2025, neither the immigration judge nor ICE were able to determine the location of multiple noncitizens who had been detained and transferred.

92.    Pursuant to binding ICE policy, ICE must follow specific procedures when determining whether to transfer an individual under certain circumstances. ICE Policy Number 11022.1, *Detainee Transfers*, states that ICE "will not transfer a detainee when there is documentation to support" that the individual has family or an attorney of record within the area (defined as the "area of responsibility," or AOR), the individual has pending or on-going removal proceedings within the area, or the individual has been granted bond or has been scheduled for a bond hearing. If any one of these factors are present, an individual may be transferred only if "a transfer is deemed necessary" by a Field Office Director ("FOD") or a designee, and specific protocols are followed. Namely, "the transfer must be approved at the Assistant Field Office Director level or higher, and the reasons for the transfer must be documented in the detainee's A-File." Moreover, if a detainee has an attorney of record, ICE must "[n]otify the attorney that the detainee is being transferred and include the reason for the transfer and the name, location, and telephone number of the new facility as soon as practicable on the day of the transfer, but in no circumstances later than twenty four (24) hours after the transfer occurs." In all transfer determinations, ICE officers must "conduct a thorough review of the most current information available." The purpose of the policy is to "minimize, to the extent possible, detainee transfers outside the AOR."

93.    ICE detention centers also are bound by the procedural safeguards sets forth in the

---

[9] Sarah Betancourt, *At Least 40 ICE Detainees Transferred to Border States in Overnight Flight*, GBH (Feb. 12, 2025), https://www.wgbh.org/news/local/2025-02-12/at-least-40-ice-detainees-transferred-to-border-states-in-overnight-flights.

Performance-Based national Detention Standards ("PBNDS") or the National Detention

Standards ("NDS). The Plymouth County Correctional Facility where Petitioner is detained is

bound by NDS. The NDS requires that "ICE/ERO will provide the detainee, in writing, with the

name, address and telephone number of the facility he or she is being transferred to and contact

the attorney of record." In addition, the NDS requires that the transferring officer have in their

possession the detained individual's transfer summary sheet at all times, and they cannot be

moved without the required information from the releasing institution.

94.    Upon information and belief, ICE routinely fails to comply with Directive

11022.1 by transferring noncitizens out of state without timely notifying their retained

counsel. In *Ozturk v. Trump et al.*, for example, ICE transferred the petitioner from

Massachusetts to New Hampshire and then to Louisiana without informing her attorney. *Ozturk*

*v. Trump*, No. 25-cv-10695-DJC, 2025 WL 1009445, at *2 (D. Mass. Apr. 4, 2025). In *Ortiz v.*

*Orange County*, the court recognized instances where noncitizens were transferred out of state

without notice to retained counsel. *Ortiz v. Orange Cnty.*, 2024 WL 113705, at *4 (S.D.N.Y. Jan.

10, 2024). Similarly, in an October 2024 letter, the American Bar Association urged ICE to

notify attorneys when their clients are transferred, citing eleven instances in which such transfers

occurred without notice to counsel. American Bar Association, *Letter from William R. Bay,*

*President, to Patrick J. Lechleitner, Acting Director, U.S. Immigration and Customs*

*Enforcement* (Oct. 23, 2024),

https://www.americanbar.org/content/dam/aba/administrative/government_affairs_office/imm-

omdc-2d-transfer-letter-23-oct-2024.pdf.

95.    ICE retains authority over immigration detention, including the decision to detain

an individual and where to detain them. At the same time, ICE also serves as the prosecutor

representing the government in removal proceedings against that individual. ICE's decision to transfer Petitioner away from the Plymouth County Correctional Facility and move him away from his husband, whose case is being heard in the same Immigration Court as Petitioner's, and his attorneys and medical experts, will be severely prejudicial to Petitioner's preparation of his asylum case. It may subject his immigration proceedings to a different circuit's law that he and his attorney may be unfamiliar with.

96.    Petitioner's immigration proceedings are currently venued in the Chelmsford Immigration Court, which oversees the cases of individuals detained at Plymouth and FCI Berlin; however, any transfer of Petitioner outside of this district will result in ICE requesting that venue be transferred in Petitioner's case away from the Chelmsford Immigration Court, which is subject to First Circuit law, to another Immigration Court subject to another Circuit's law.

### H.    Transfer Of Petitioner Will Impede His Access to Counsel.

97.    Transferring Petitioner to a detention center out of this district will impede Petitioner's ability to retain and access effective assistance of counsel.

98.    If Petitioner is transferred, his immigration attorney may no longer be able to represent him in his removal proceedings. Petitioner is represented *pro bono* by Daniela Hargus, an attorney at the Political Asylum/Immigration Representation (PAIR) Project, a nonprofit legal services organization. If Petitioner is transferred out of state, his attorney may be forced to withdraw from his case due to limited *pro bono* funding, leaving him without counsel in his immigration proceedings. It is exceedingly difficult to retain new counsel in a jurisdiction and state that Petitioner has no ties to and with limited pro bono attorneys. Nationally, those in removal proceedings who are detained are nearly five times less likely to obtain counsel than

those who are not detained. Ingrid V. Eagly & Steven Shafer, *A National Study of Access to Counsel in Immigration Court,* 164 U. Pa. L. Rev. 1, 32 (2015). Inability to access counsel will have a devastating impact on all of his legal proceedings. Individuals who are detained and represented are ten-and-a-half times more likely to obtain immigration relief that those who are detained and unrepresented. *Id.* at 49.

99.    Even if Petitioner is able to retain his current counsel, his transfer to an out-of-state distant detention center will impede access effective assistance of counsel. In-person meetings between Petitioner and his attorney, as well as medical experts, are necessary for all aspects of representation in his immigration proceedings, including seeking immigration relief. In-person meetings are necessary, for example, for interviewing him about trauma he has suffered such as physical or sexual violence to obtain a lengthy personal declaration; preparing his legal claims and eligibility for relief such as asylum; counseling him as to his legal options and developments in his case; obtaining signatures on immigration relief applications and release forms when seeking client records from outside agencies; and preparing him to testify in court. Because of the highly sensitive nature of these conversations, in-person meetings are necessary to ensure Petitioner can openly communicate with his counsel. However, Petitioner's *pro bono* attorney does not have the capacity or the resources to travel hundreds or thousands of miles across state lines to immigration detention centers in jurisdictions outside of Massachusetts to meet with him in-person. Any decision by Respondents to transfer Petitioner will obstruct his ability to meet with his attorney in-person, which impedes his attorney's ability to speak with him, provide him with legal advice, and represent him effectively in court.

100.    In fact, Respondents' decisions to transfer Petitioner's husband Irvin away from the Plymouth County Correctional Facility and to FCI Berlin, and to place Irvin in proceedings

long before Petitioner has already materially interfered with the preparation of both men's asylum cases. For example, even though both men's asylum cases were consolidated before they were detained because they are inextricably intertwined, the cases are now proceeding separately. In addition, because Petitioner is detained, and at a separate facility from his husband Irvin, and Irvin's individual hearing is scheduled to occur on July 28, 2025, it is likely that ICE will not agree to make Petitioner available to testify in Irvin's case, even though Petitioner is a key fact witness to support his husband's claim for protection based on past persecution and a well-founded fear of future persecution in Venezuela.

101.    In addition, Petitioner's transfer out-of-state will impede his ability to effectively communicate with his counsel even remotely. Several organizations have reported on the substantial restrictions on telephone access and virtual meetings within immigration detention centers and the long delays in sending and receiving legal mail. *See* Michael Kaufman, Detention, Due Process, and the Right to Counsel in Removal Proceedings, 4 Stan. J. C.R. & C.L. 113, 127 (2008) ("The practical constraints caused by detention, including the remote location of detention facilities, ICE transfer policies, [and] detention facility rules that limit visitations and phone calls . . . create impediments to retaining counsel [and] frustrate detainees' ability to prepare their cases").

102.    Petitioner's transfer may further impact his attorney's ability to provide effective assistance of counsel by subjecting his proceedings to a different circuit's law, separate from his husband's claim, which is directly tied to Petitioner's. Petitioner's attorney is an immigration attorney who practices in Massachusetts, which applies First Circuit law. However, if Petitioner's case is transferred from the Chelmsford Immigration Court to another Immigration Court, Petitioner's proceedings will be subject to another Circuit's law. This change in law may

harm Petitioner's case because he has already submitted an asylum application, which relies on First Circuit law, and his husband's case will be decided under First Circuit law.

103.    Petitioner is now in custody at the Plymouth County Correctional Facility in the District of Massachusetts, and one or more of the Respondents is his immediate custodian.

## CLAIMS FOR RELIEF

### COUNT ONE
### Violation of Due Process of the Fifth Amendment of the United States Constitution
### (Based On Delay In Removal Proceedings)

104.    Petitioner repeats and realleges all the allegations above and incorporate them by reference here.

105.    The Due Process Clause of the Fifth Amendment to the U.S. Constitution provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

106.    The Due Process Clause does not permit the government to detain Petitioner without promptly presenting him before a judge.

107.    Respondents' policies, practices, acts, and omissions as to Petitioner violates the procedural component of the Due Process Clause by causing the detention of Petitioner without prompt judicial presentment.

108.    Respondents' policies, practices, acts, and omissions as to Petitioner violate the substantive component of the Due Process Clause by causing the detention of Petitioner without prompt judicial presentment.

109.    As a proximate result of Respondents' violations of the Due Process Clause, Petitioner is suffering and will continue to suffer a significant deprivation of his liberty without due process of law. The relief sought by Petitioner is necessary to prevent continued and future

irreparable injury.

110. Respondent's arbitrary and unlawful actions have caused Petitioner to already have been detained for months without being presented before an Immigration Judge. Based on Respondent DHS's deliberate actions, it will be six months before Petitioner is currently scheduled to appear before an Immigration Judge. In *Demore v. Kim*, 538 U.S. 510, 518 (2003), the Supreme Court identified mandatory detention pending removal proceedings as a "brief period," lasting "roughly a month and a half in the vast majority of cases in which it is invoked, and about five months in the minority of cases in which the alien chooses to appeal." Here, Petitioner will not have even seen an Immigration Judge for the first time until he has already been detained for multiple months; under the Immigration Court's current schedule, by the time his case is full resolved, Petitioner may well be detained for close to a year. Under the Supreme Court's own standards, Petitioner's detention is unreasonably prolonged.

111. Petitioner's already lengthy detention without being presented to an Immigration Judge, which has been unreasonably prolonged based on Respondents' arbitrary and unlawful actions, violates the Fifth Amendment by depriving him of liberty without due process of law. This Court should order Petitioner's release or, in the alternative, order the Chelmsford Immigration Court to conduct a bond hearing before a neutral arbiter.

## COUNT TWO

### Violation of Due Process of the Fifth Amendment of the United States Constitution (Based On Imminent Risk of Transfer)

112. Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Petition as if fully set forth herein.

113. Noncitizens are entitled to due process of law in their immigration proceedings. *Mekhoukh v. Ashcroft*, 358 F.3d 118, 128 (1st Cir. 2004) (quoting *Morales v. INS*, 208 F.3d 323,

327 n.1 (1st Cir. 2000)). Arising from this general due process right is the right to effective

assistance of counsel. *See Lozada v. INS,* 857 F.2d 10, 13 (1st Cir. 1988); *Essen v. Gonzales,* 240

F. App'x 873, 875 (1st Cir. 2007); *Guerrero-Santana v. Gonzales,* 499 F.3d 90, 93 (1st Cir.

2007).

114.    Respondents' practice of detaining and transferring Petitioner out-of-state violates

his Fifth Amendment right because it would effectively restrict him from communicating with

his retained counsel in Massachusetts. Petitioner would not be able to have face-to-face meetings

with his counsel, obtain in-person resources to support his asylum case, and will encounter an

array of obstacles in contacting his counsel remotely from the out-of-state facility.

115.    For these reasons, Petitioner's out-of-state transfer would violate the Due Process

Clause of the Fifth Amendment.

**COUNT THREE**
**Violation of Immigration Nationality Act**

116.    Petitioner repeats and re-alleges the allegations contained in the preceding

paragraphs of this Petition as if fully set forth herein.

117.    The INA guarantees individuals in removal proceedings are entitled to due

process, which includes the right to counsel of their choosing. 8 U.S.C. §§ 1362,

1229a(b)(4)(A); *see, e.g.*, *Aguilar v. U.S. Immigr. & Customs Enf't Div. of Dep't of Homeland

Sec.*, 510 F.3d 1, 13 (1st Cir. 2007); *see also Lozada v. INS*, 857 F.2d 10, 13 (1st Cir. 1988). The

INA also provides that immigrants shall have a reasonable opportunity to present evidence on

their own behalf. 8 U.S.C. 1229a(b)(4)(B).

118.    Respondents' detention and imminent transfer of Petitioner would violate his

statutory right to counsel by preventing him from finding, retaining, and communicating

effectively with legal representatives.

119.    Respondents' conduct also violates Petitioner's statutory right to present evidence by restricting their ability to collect evidence and communicate with potential witnesses and experts, as is necessary for them to meaningfully prepare and present their legal cases.

120.    For these reasons, Petitioner will suffer injury as a proximate result of Respondents' violation of 8 U.S.C. § 1229a(b)(4)(A), 8 U.S.C. § 1229a(b)(4)(B), and 8 U.S.C. § 1362 through the practice of transferring him out-of-state.

**COUNT FOUR**
**Violation of the Administrative Procedures Act**

121.    Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Petition as if fully set forth herein.

122.    The Administrative Procedure Act provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.

123.    The Administrative Procedure Act further provides that a reviewing court shall "compel agency action unlawfully withheld or unreasonably delayed" and "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] without observance of procedure required by law." 5 U.S.C §§ 706(1), (2)(A)-(D).

124.    Respondents attempted to transfer Petitioner in violation of ICE Policy Number 11022.1. Respondents arbitrarily dismissed Petitioner's first Notice to Appear even though he had already passed a credible fear interview. Respondents held and continue to hold Petitioner in detention without presenting him to an Immigration Judge.

125.    Respondents' policies, practices, acts, or omissions as described herein and as to Petitioner are final agency actions that are (A) arbitrary and capricious, and inconsistent with the purposes and concerns of relevant statutes or laws, (B) contrary to constitutional right, power, privilege or immunity, (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, and/or (D) without observance of procedure required by law, in violation of 5 U.S.C. §§ 702, 706(1), (2)(A)-(D).

126.    Under the APA, an agency's unexplained failure to follow its own rules constitutes "arbitrary" and "capricious" agency action. 5 U.S.C. § 706(2)(A); *United States ex. rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954); *Morton v. Ruiz*, 415 U.S. 199, 235 (1974); *Rotinsulu v. Mukasey*, 515 F.3d 68, 72 (1st Cir. 2008); *Jimenez v. Cronen*, 317 F. Supp. 3d 626, 638–39 (D. Mass. 2018).

127.    As a proximate result of Respondents' violations of the Administrative Procedure Act, Petitioner is suffering and will continue to suffer a significant deprivation of his liberty and denial of the rights, privileges, and procedures afforded him under the Constitution and the INA. Petitioner has no plain, adequate or complete remedy at law to address the wrongs described herein. The relief sought by Petitioner is necessary to prevent continued and future irreparable injury.

128.    For at least these reasons, Petitioner has been aggrieved by the Respondents under the Administrative Procedures Act.

## **PRAYER FOR RELIEF**

Wherefore, Petitioner respectfully requests this Court grant the following:

(1) Assume jurisdiction over this matter;

(2) Order that Petitioner shall not be transferred outside the District of Massachusetts;

(3) Declare that the Petitioner's detention violates Procedural and Substantive Due Process as well as the Immigration & Nationality Act and Administrative Procedure Act.

(4) Issue a Writ of Habeas Corpus ordering Respondents to release Petitioner immediately.

(5) Order the Chelmsford Immigration Court to conduct a bond hearing at which the government bears the burden of proving flight risk and dangerousness by clear and convincing evidence.

(6) Award Petitioner reasonable attorney's fees and costs under the Equal Access to Justice Act, and on any other basis justified under the law; and

(7) Grant any further relief this Court deems just and proper.

Respectfully submitted,

Rodelwin Del Carmen Freites-
Espinoza

By his attorneys,

Dated: June 27, 2025

_____
Irene C. Freidel
BBO# 559051
Political Asylum/Immigration
Representation (PAIR) Project
98 North Washington St, Ste. 106
Boston, MA 02114
(617) 947-6349
ifreidel@pairproject.org

_____
Daniela N. Hargus
BBO# 711041
Political Asylum/Immigration
Representation (PAIR) Project
98 North Washington St, Ste. 106
Boston, MA 02114
(978) 502-7448
dhargus@pairproject.org

## **CERTIFICATE OF SERVICE**

I, Irene C. Freidel, hereby certify that this document filed through the ECF system will be sent electronically to the Respondents who are registered ECF participants as identified on the Notice of Electronic Filing (NEF)

Dated: <u>June 27, 2025</u>

_Irene C. Freidel_

_____

Irene C. Freidel